IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**KRISTINA PIERCE,**                )
                                     )
                    **Plaintiff,**   )
                                     )
**vs.**                              )     **Civil No.** 15-cv-231-CJP[1]
                                     )
**CAROLYN W. COLVIN,**               )
**Acting Commissioner of Social**    )
**Security,**                        )
                                     )
                    **Defendant.**   )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kristina Pierce, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. §423.

## Procedural History

Plaintiff applied for benefits in August 2012, alleging disability beginning on December 16, 2011. (Tr. 15). After holding an evidentiary hearing, ALJ Victoria A. Ferrer denied the application for benefits in a decision dated October 29, 2013. (Tr. 15-26). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in determining plaintiff's credibility.

2. The ALJ's erred in determining plaintiff's RFC.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or

> equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** See also, **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on

3

Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, *Books v. Chater,* 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater,* **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* **402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater,* **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue,* **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

4

## **The Decision of the ALJ**

ALJ Ferrer followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since her alleged onset date. She found plaintiff had severe impairments of degenerative disc disease, lumbar spine, history of cervical fusion, and was overweight. The ALJ determined these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light level with physical limitations. Based on the testimony of a vocational expert (VE), the ALJ found the plaintiff was unable to perform her past work. However, there were jobs that existed in significant numbers in the national and local economies that plaintiff could perform. (Tr. 15-26).

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### **1. Agency Forms**

Plaintiff was born on August 31, 1974 and was thirty-seven years old at her alleged onset date. (Tr. 206). Plaintiff was five feet seven inches tall and weighed one hundred and sixty-seven pounds. (Tr. 210). She completed one year of college and previously worked as a tire inspector, laborer, waitress, retail manager, and in residential and commercial cleaning. (Tr. 211-12, 219).

Plaintiff claimed that lower back lumbago, depression, and degenerative arthritis limited her ability to work. (Tr. 210). She took Cymbalta for depression, Gabapentin for restless leg syndrome and as a sleep aid, and she took Relafen for pain relief. (Tr. 264).

Plaintiff submitted two function reports, one in August 2012 and another in February 2013. (Tr. 198-204, 250-58). In August 2012, plaintiff claimed that she got her children ready for school each day, tidied up the house, fed the dogs, and prepared herself meals. (Tr. 198). Her husband and children helped her around the house and with their dogs. (Tr. 199). She stated that she was unable to handle finances and could no longer be as active with her children as she was previously. (Tr. 202). Her memory was intact and she did not need to be reminded to go places. (Tr. 199-202). She claimed difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, and climbing stairs. She could walk approximately half a mile before needing to sit and rest for fifteen to twenty minutes. (Tr. 203).

In February 2013, plaintiff stated that sitting caused discomfort in her back and nerve pains down her left leg. (Tr. 250). She could make simple meals like cereal or frozen dinners but still needed help from her son and husband. She could do the laundry for thirty minutes daily but was unable to perform any other household chores. (Tr. 252). She could drive a car and handle the family's finances. If plaintiff went grocery shopping she needed someone else to accompany her. (Tr. 254). She had no problems with her memory. (Tr. 251, 252, 255).

Plaintiff claimed to have difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and completing tasks. She could walk less than a quarter mile and would need to rest an hour before she was able to resume walking. Plaintiff had no difficulty following written or spoken instructions. (Tr. 256). While she had difficulty handling stress, she could get along with others and handle changes in her routine fine. (Tr. 257). Plaintiff stated that her depression was worsening and her physical discomfort was constant. (Tr. 258).

Plaintiff's husband also completed a function report in October 2012. (Tr. 230-37). He lived with plaintiff in a house and stated that plaintiff had difficulty standing, walking, lifting, and bending. (Tr. 230). On a daily basis, plaintiff got their children ready for school, performed light house work, and helped the children with their after school activities. (Tr. 231). He indicated that plaintiff needed help lifting laundry and could no longer mop the floors or take out the trash. He stated that plaintiff could prepare a wide variety of meals but the entire family had to help prepare larger meals. (Tr. 232). Plaintiff was able to drive and could shop for household items two or three times a week. (Tr. 233).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing held on September 20, 2013. (Tr. 33). She lived in a home with her husband and four children. (Tr. 51). Her children ranged in age from eleven to nineteen. (Tr. 45). Her children participated in after school activities but she had difficulty sitting

through their baseball and football games. (Tr. 45-46). She used to ride motorcycles but sold hers recently because she was no longer able to ride. (Tr. 47). Plaintiff last worked on December 16, 2011. (Tr. 35). She was on short term disability with her last employer for six months after that date and at the time of the hearing was on long term disability. (Tr. 35-36).

Plaintiff had surgery on her lumbar spine in June 2012 and at the time of the hearing had recently begun physical therapy. (Tr. 36-37). Her pain was worse when she sat or did any activity that required twisting. (Tr. 38). Plaintiff was able to sit in a car for two hours to drive to St. Louis, but she needed to stop at least twice during the drive. (Tr. 39). She testified that she could only sit for fifteen to thirty minutes at a time. (Tr. 55). Plaintiff had sharp pain and numbness in her left foot. (Tr. 53). She stated that she had difficulty walking more than one block at a time. (Tr. 38). Plaintiff did not carry anything heavier than a gallon of milk because she frequently dropped items. (Tr. 55-56).

Plaintiff had nerve pain that radiated from her back down her leg and into her foot. (Tr. 43). She took Gabapentin three times a day to help with her nerve pain, and for her back pain she took Tramadol twice a day, and had a pain patch she could wear for up twelve hours. (Tr. 42). Plaintiff also had a history of migraines. She had cervical fusion to reduce their frequency, but she still had headaches daily. (Tr. 41). Occasionally she took Advil to help with her headache pain. (Tr. 42). Plaintiff did not feel the medications relieved all of her pain but it "took the edge off." (Tr. 44). Plaintiff also took medication for depression and regularly saw her primary care physician for help with mental

health. (Tr. 49-50). She felt the medication she took for depression helped and the amount of "bad days" she had decreased. (Tr. 50).

Plaintiff did not perform many household tasks beyond cooking light meals during the week. (Tr. 52). The day after she had physical therapy she could not cook light meals due to increased pain. (Tr. 53). Her children did their own laundry and she was unable to dust, vacuum, sweep, or mop. (Tr. 52). Plaintiff stated that she spent about ninety percent of her day lying on the couch with a pillow between her legs. (Tr. 55).

A vocational expert (VE) also testified. (Tr. 56-60). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform work at the light level, limited to occasional stooping and frequent climbing of stairs, ramps, ladders, ropes, and scaffolds. The person would be limited to occasional kneeling, crouching, and crawling. Additionally, the person must avoid concentrated exposure to wetness and humidity. The VE testified that this person could perform plaintiff's previous work as a small parts assembler, retail manager, and courier. (Tr. 57). The VE also stated that the person could perform additional jobs that exist in significant numbers in the national economy such as cashier, mail clerk, and counter attendant. (Tr. 58).

The VE also stated that the person would be unable to retain employment if she were off task fifteen percent of the day, absent more than once a month, or needed to lie down for more than a third of the day. However, if the person was unable to sit for more than thirty minutes or could only walk

a block without resting the jobs would remain as they primarily involve static standing. (Tr. 59-60). At the conclusion of the hearing, plaintiff's attorney attempted to ask plaintiff additional questions but the ALJ did not allow further questioning. (Tr. 61).

### 3. Medical Records

Plaintiff's records contain a history of mental and physical health treatment. Throughout plaintiff's medical records she has a history of hypertension, depression, obesity and back pain. (*Ex.* Tr. 278, 334, 402, 407, 416, 420). Plaintiff's mental health records began in April 2012 when she reported to her primary care physician, Dr. Megan Neely, with a severe episode of depression. (Tr. 285-86). Dr. Neely prescribed plaintiff Paxil and Lunesta to help her decrease her anxiety and depression and to help her reset her sleep pattern. (Tr. 286). Plaintiff returned the next month and noted an improvement in her depression symptoms. (Tr. 283-84). In June 2012, plaintiff returned to Dr. Neely still doing well on Paxil and sleeping well with Lunesta. (Tr. 280-82). Plaintiff's final medical notes involving depression were from July 2012. (Tr. 278-79). Dr. Neely noted that plaintiff had "significant improvement" in her symptoms and plaintiff was doing well. (Tr. 278-79).

Plaintiff's physical medical history records began in December 2010. (Tr. 367). She presented to the Orthopedic Center of St. Louis with neck pain and headaches that radiated into her shoulders. She had a large disc herniation at C6-7 and a smaller one at C5-6. (Tr. 367). Later that month, plaintiff had a

microdiscectomy[2] at C5-6 and C6-7, and anterior cervical fusion at C5-6 and C6-7 with threaded allograft. (Tr. 386). At plaintiff's follow-up appointments with the Orthopedic Center, the records indicate plaintiff recovered fairly well. (Tr. 361, 362, 363, 364, 365).

In January 2012, plaintiff returned to the Orthopedic Center and reported pain in her low back to left buttock, left posterior thigh, and left posterior calf. She had decreased plantar flexion on the left and her sensation was decreased on the left side. Dr. Matthew Gornet reviewed plaintiff's radiographs and stated that the MRI displayed a significant loss of disc height at L5-S1. He stated that this would correlate with her physical exam and symptoms. Dr. Gornet prescribed two weeks of oral steroids and recommended following up in six weeks for a new MRI. (Tr. 361). In March 2012, plaintiff returned to the Orthopedic Center for a follow up and her MRI revealed disc herniation and annular tear in the foramen on the left at L5-S1 with a smaller protrusion at L4-5. Dr. Gornet recommended steroid injections and a follow up. (Tr. 360).

In April 2012, plaintiff saw Dr. Gornet for a follow-up. The steroid injections did not provide relief and he recommended laminotomy and foraminotomy[3] left L5-S1 with microdiscectomy. (Tr. 359). In early June 2012,

---

[2] A microdiscectomy is a surgical procedure to remove the damaged portion of a herniated disc in the spine. http://www.mayoclinic.org/tests-procedures/diskectomy/basics/definition/prc-20013864

[3] A Laminotomy is the removal of a small portion of the ligaments and lamina to decrease the chance of postoperative spinal instability.  A foraminotomy is the removal of bone around the

plaintiff saw Dr. Neely for a pre-operative evaluation. Dr. Neely noted plaintiff's "exercise capacity [was] great" and that she had four children with whom she was very active. (Tr. 280). On June 12, 2012, plaintiff underwent the laminotomy and microdiscectomy. (Tr. 379-81). The operation went well and after surgery her leg pain improved. However, two weeks later plaintiff presented at the emergency room because her pain returned and she had a low-grade fever. (Tr. 358, 337).

After seeing Dr. Gornet, plaintiff was admitted to the hospital where it was discovered that she had a post-operative staph infection. (Tr. 357-58, 278-79). Dr. Gornet drained the surgical site and started plaintiff on antibiotics. (Tr. 324, 331-36, 377-78). On a follow-up appointment with Dr. Gornet in September 2012 plaintiff's infections were gone but she still had some left buttock and leg pain. Dr. Gornet recommended exercise and convalescence. (Tr. 356).

In January 2013, plaintiff began seeing Dr. Brian Steinke at the Orthopedic Center of Southern Illinois. (Tr. 425). She complained of lower back pain on the left side and Dr. Steinke noted that plaintiff did not have resolution of the pain she had before surgery. (Tr. 425, 420). Dr. Steinke recommended plaintiff receive steroid injections. (Tr. 420). Plaintiff received the steroid injections and returned to Dr. Steinke in May 2013. (Tr. 407, 12-17, 460, 468). Dr. Steinke reviewed her latest MRI and noted that she had a collapsed disc

---

space between vertebrae where the nerve root exits the spinal canal.
http://www.mayfieldclinic.com/PE-Decompression.htm

but no significant foraminal stenosis or disc herniation. He ordered a nerve conduction study and decided to base future treatment on the study's results. (Tr. 407). She returned the next month and her treatment notes indicate she failed all conservative treatment including injections and physical therapy. (Tr. 402).

In June 2013, plaintiff began seeing neurologist Tomasz Kosierkiewicz who reviewed plaintiff's nerve conduction study and evaluated plaintiff. He stated that the nerve conduction study was significant only for minimally reduced compound muscle action potential on the left tibial nerve when compared to the right. He referred plaintiff to physical therapy. (Tr. 470-73).

### 4. RFC Assessments

State agency physician C.A. Gotway, M.D., assessed plaintiffs physical RFC in October 2012. (Tr. 65-69). He did not evaluate plaintiff but reviewed her records. He opined that plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry up to ten pounds. He felt plaintiff could stand, walk, or sit for a total of six hours out of an eight hour workday. Dr. Gotway stated that plaintiff could frequently climb ramps, stairs, ladders, ropes, and scaffolds. Additionally, she could frequently stoop, kneel, crouch, and crawl. (Tr. 67).

In February 2013, state agency physician, Dr. Charles Kenney, M.D., also reviewed plaintiff's medical records and provided a physical RFC assessment. (Tr. 75-79). His impressions mirrored those of Dr. Gotway. (Tr. 76-

77). He noted that while plaintiff was having buttock and leg pain she was functioning relatively well. (Tr. 77).

**Analysis**

Plaintiff contends that the ALJ erred in forming her credibility assessment and in the RFC analysis. As plaintiff relies in part on her testimony for her arguments, the Court will first consider her argument that the ALJ erred in her credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." ***Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for her credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")** The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." ***Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).** However, if the adverse credibility finding is premised on inconsistencies

between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ presented several reasons she felt plaintiff was not credible, and plaintiff presents lengthy arguments as to why she believes the ALJ's analysis is flawed. For the sake of clarity, this Court will review the credibility analysis in the manner it is presented within the ALJ's opinion.

The ALJ first discussed plaintiff's function reports and noted several inconsistencies between the two reports plaintiff submitted. She looked at the fact that plaintiff stated she did not have the capacity to handle the finances in her first report, but six months later reported no problems in this area. The ALJ noted that plaintiff reported she did not cook on her own but also reported fixing dinner was part of her daily routine. ALJ Ferrer also mentioned portions of plaintiff's testimony that were in contradiction to her function reports, such as her inability to dust and her enjoyment of reading. The ALJ noted inconsistences within the distances plaintiff stated she could walk as well. The ALJ explained that these inconsistencies throughout the record undermined plaintiff's credibility. (Tr. 22).

The ALJ went on to opine that plaintiff's admitted activities were contrary to her testimony that she had more difficulty sitting than any other postural positioning. She also looked at the objective medical records and noted that plaintiff's clinical findings did not support plaintiff's testimony and reported limitations. She provides examples like reports of no pain, a doctor's note that indicated plaintiff had great exercise capacity from keeping up with her children, and several medical records indicating she had normal motor, sensation, and reflexes. (Tr. 23).

Plaintiff argues that the ALJ erred here by not performing a longitudinal analysis of the evidence. As plaintiff notes, ALJs must view the record as a whole and to attempt to find a reason why any discrepancies within the record exist. **20 C.F.R. § 1529(c)(3), SSR 96-7p.** Plaintiff claims that the ALJ failed to consider the fact that her levels of functioning were highly variable. She also contends that the ALJ ignored relevant medical and non-medical evidence throughout the record to form her credibility assessment. The Seventh Circuit has held that taking a "sound bite" approach to the record is error. ***Scrogham v. Colvin*, 765 F.3d 685 (7th Cir. 2014).** The ALJ here, however, looked at all the evidence on record and did not demonstrate plaintiff's argued "sound bite" approach.

Plaintiff cites a litany of examples from the record to demonstrate the ALJ's failure to consider evidence in opposition to her opinion. However, as the Commissioner points out, the ALJ does discuss many of the examples plaintiff cites. For example, plaintiff states that the ALJ failed to discuss her ER

treatment from July 29, 2012. The ALJ discussed this portion of the record and noted plaintiff was diagnosed with acute low back pain. (Tr. 21, citing 334). Plaintiff says the ALJ ignored when she had a visit with Dr. Gornet where she was scheduled to have surgery to remove excess fluid from an infection. However, the ALJ noted plaintiff's infection and the surgery that followed. (Tr. 21).

Additionally, as the Commissioner notes, the ALJ is not required to mention every piece of evidence within the record. The Seventh Circuit has held that "[t]he ALJ's failure to address [certain] specific findings . . . does not render [her] decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in [her] decision." ***Sims v. Barnhart,*** **309 F.3d 424, 429 (7th Cir. 2002).** The ALJ provided a comprehensive review of the entire record and a lengthy discussion of plaintiff's credibility. Her failure to mention every piece of evidence on record does not render her opinion invalid.

Moreover, there is no evidence on record that indicates plaintiff's status was variable between the time of the first function report and the second. There are only two doctor visits on record within that time frame and the ALJ discussed these thoroughly. (Tr. 21). She noted that plaintiff had pain with forward flexion and limited extension with pain. She noted that plaintiff was diagnosed with significant degenerative changes and prescribed narcotics. The ALJ discussed almost every portion of these records plaintiff claims she ignored. (Tr. 21, citing 425). Plaintiff attempts to explain this by stating that

the credibility determination is confined to pages seven through nine and therefore any medical evidence discussed outside of these pages is not relevant to the credibility assessment. This is untrue as an ALJ's credibility analysis is not confined to one section and may be woven throughout her opinion. ***Sawyer v. Colvin*, 512 F. App'x 603, 608 (7th Cir. 2013).** The ALJ here looked at the exact records plaintiff argues she did not, but did it in another section of her opinion. This is not error.

The ALJ also noted that plaintiff's testimony regarding memory problems was not supported by the record and was directly contradicted by her function reports and doctors' notes. (Tr. 22). Plaintiff provides no argument as to why this discrepancy exists. While this inconsistency is small, it does represent an instance where plaintiff's claimed to have a functional limitation that was not corroborated by the objective medical records.

Plaintiff argues that the ALJ failed to consider plaintiff's medications and treatment regimens. This is false. The ALJ explicitly discussed plaintiff's pain medications and reported ineffectiveness of treatment. The ALJ did not state that the pain medications or treatment she received was insignificant. She did explain, however, that there was a lack of clinical findings to support the extreme limitations plaintiff claimed. For example, plaintiff claimed an extreme limitation in her ability to walk even short distances. However, the ALJ noted that the medical records did not indicate plaintiff had any limitations when it came to walking. This does not mean plaintiff had no limitations in her ability to walk, but it is indicative of a potential exaggeration. As noted above, the ALJ

may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." **Getch, 539 F.3d at 483.** That is exactly what the ALJ appropriately did in the case at hand.

The ALJ felt that plaintiff's claims that she did not make beds, do laundry, pull weeds, vacuum, sweep, and mop were not supported by a physical examination because plaintiff "was able to produce heel, toe, and tandem gait and had full 5/5 motor strength throughout." (Tr. 23). Plaintiff contends that the ALJ lacks the ability to make the link between the medical findings and plaintiff's subjective complaints of pain. This argument is well taken.

The Seventh Circuit has held that it is impermissible for an ALJ to "play doctor" and substitute her opinion for that of a doctor. **Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014).** Additionally, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion. **Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).** That is exactly what the ALJ did here in determining one random clinical note was in opposition to plaintiff's claims about her activities of daily living. The ALJ also misconstrued evidence when she noted that plaintiff could sit for five innings of her son's baseball games. (Tr. 23). Plaintiff testified that she had to take her son out of baseball because she could no longer sit at the games. (Tr. 45-46). The ALJ clearly erred in discounting plaintiff's claims based on one treatment note and

out of context testimony. If the ALJ had based her credibility determination on these errors, it would warrant reversal.

Ultimately, however, ALJ Ferrer considered other appropriate factors and supported her conclusion with reasons derived from evidence. The Seventh Circuit has held that not all of the ALJ's reasons have to be sound as long as "enough of them are." *Halsell v. Astrue*, **357 Fed. Appx. 717, 722 (7th Cir. 2009).**

As a whole, plaintiff's arguments regarding the credibility analysis miss the mark. As the Commissioner aptly notes, the ALJ did find that plaintiff's conditions could reasonably be expected to cause pain and other symptoms. She discussed plaintiff's medications and treatment history. However, she found that based on subjective and objective information contained in the record, some of plaintiff's claims were not entirely credible.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, **573 F.3d 503, 517 (7th Cir. 2009). See, SSR 96-7p.** The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, **529 F.3d 408, 413-414 (7th Cir. 2008).** Here, the analysis is far from patently wrong. It is evident that ALJ Ferrer considered some of the appropriate factors and built the required logical bridge from the evidence to her conclusions about plaintiff's testimony. *Castile v. Astrue*, **617 F.3d 923, 929 (7th Cir. 2010).** Therefore, her credibility determination stands.

The Court then turns to plaintiff's first argument regarding her RFC. Plaintiff contends that the ALJ's RFC analysis was flawed because it failed to explain how plaintiff's severe impairment of being overweight was incorporated into the assessment.

An RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." **Ibid**.  "As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians. **See *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir.1995).** Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

ALJ Ferrer determined plaintiff retained the RFC to perform light work with some physical limitations. (Tr. 20). The ALJ stated within her decision that she gave great weight to the state agency physicians' opinions except for their opinions regarding plaintiff's ability to stoop. She reasoned that plaintiff's lumbar degenerative disc disease and back tenderness warranted a greater limitation than frequent stooping. (Tr. 24). It is important to note that it is proper for the ALJ to rely upon the assessment of state agency consultants. ***Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).** "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."

Social Security Ruling 96-6p, at 2.  Here, the opinions of Drs. Gotway and Kenny provide sufficient support for ALJ Ferrer's RFC assessment.

Plaintiff argues that the ALJ failed to elaborate upon or explain how plaintiff's status as overweight was factored into her RFC determination. First, the ALJ discussed how plaintiff's height and weight throughout her records yields a body mass index that qualifies as "overweight." (Tr. 21). The ALJ stated that she considered plaintiff's weight in determining her RFC and that she found "no further residual functional capacity limitation resulting from her overweight status." (Tr. 23).

Plaintiff maintains that this is insufficient reasoning because the ALJ did not state how she found plaintiff being overweight to qualify as a severe impairment. Essentially, plaintiff argues that there is no reason for the ALJ to have included "overweight" as a severe impairment. Plaintiff does not argue that the ALJ erred by not including greater limitations, but that the classification of being overweight as a severe impairment was error in and of itself.

This Court will assume arguendo that the ALJ erred in including "overweight" as a severe impairment because she failed to adequately explain her reasoning why. The Seventh Circuit has repeatedly held that "the absence of rationale may constitute harmless error if the agency's decision is overwhelmingly supported by the record and thus remand would be pointless." **Mueller v. Colvin, 524 Fed. Appx. 282, 285 (7th Cir. Ill. 2013);** *See also,* *Spiva v. Astrue,* **628 F.3d 346, 353 (7th Cir. 2010);** *Allord v. Barnhart,*

**455 F.3d 818, 821-22 (7th Cir. 2006).** Additionally, the Seventh Circuit has stated that to determine if an error is harmless, "we look at the evidence in the record to see if we can predict with great confidence what the result on remand will be." ***McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. Ill. 2011).** Here, ALJ Ferrer did not base her RFC assessment on the inclusion of this impairment and there is no indication this impairment altered her analysis in any way. This Court can say with great confidence that if this case was remanded and the severe impairment of "overweight" was not included the result would be the same. Therefore, this inclusion is, at worst, harmless error.

If, as the Commissioner notes, plaintiff provided additional substantiated limitations due to being overweight that the ALJ failed to include, a reversal could be warranted. However, plaintiff does not make this argument and the Seventh Circuit has stated that a "claimant must articulate how her obesity limits her functioning and exacerbates her impairments." ***Hisle v. Astrue*, 258 Fed. Appx. 33, 37 (7th Cir. Ind. 2007); *See also, Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Dornseif v. Astrue*, 499 Fed. Appx. 598, 600 (7th Cir. Ill. 2013).** This Court fails to see the inclusion of being overweight as a severe impairment as error and plaintiff's argument is rejected.

In sum, plaintiff's argument on both of her points is, in effect, nothing more than an invitation for the Court to reweigh the evidence. However, the reweighing of evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Ms. Pierce is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot

make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. ***Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).** ALJ Ferrer's decision is supported by substantial evidence, and so must be affirmed.

## <u>Conclusion</u>

After careful review of the record as a whole, the Court is convinced that ALJ Ferrer committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Kristina Pierce's application for disability benefits is **AFFIRMED** and plaintiff's motion for summary judgment is **DENIED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE: March 14, 2016.**

**<u>s/ Clifford J. Proud</u>**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**

24